UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Jon Manning,

   Plaintiff,

   v.          Civil Action No. 5:11-CV-253

Michael J. Astrue,
Commissioner of Social Security,

   Defendant.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 6, 7)

Plaintiff Jon Manning brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying his application for disability insurance

benefits. Pending before the Court are Manning's motion to reverse the Commissioner's

decision (Doc. 6), and the Commissioner's motion to affirm the same (Doc. 7). For the

reasons stated below, I recommend that Manning's motion be DENIED, and the

Commissioner's motion be GRANTED.

## <u>Background</u>

Manning was thirty-seven years old on his alleged disability onset date of

September 13, 2006. He lives with his wife and three children. He completed high

school, and has experience working as a car wash attendant, a delivery person at a donut

shop, a dishwasher at a restaurant, a distribution clerk for a newspaper publisher, a

material handler at a factory, and a snow maker at a ski resort.

In December 2005, Manning was injured at work while tossing newspapers into a van. He felt a pop in his back and has had pain, particularly in his back and legs, ever since. (AR 44.) Manning stated at the administrative hearing that he used a cane to avoid falling when he had stabbing pain or muscle spasms in his right hip. (AR 45-46.) He stated that he suffered from numbness in both feet, could not move around very well, and could neither sit nor stand for extended periods. (AR 46.) He further stated that he spent six-to-eight hours in a recliner during the day (AR 53); and approximately two-to-three times each week, he stayed in bed all day (AR 56). He has tried physical therapy, epidural injections, and chiropractic services, among other things, to address his pain; and has also been prescribed muscle relaxers, sleeping aids, and pain medication. (AR 45.)

On June 3, 2009, Manning filed an application for disability insurance benefits. Therein, he alleged that, starting on September 13, 2006, he has been unable to work due to chronic lower back pain, hip pain, numbness in his left leg, and muscle cramps. (AR 209.) He explained that, if he sits or stands for more than thirty minutes, he gets muscle spasms and must change positions, and that he has pain when standing up and sitting down. (*Id.*) Manning's application was denied initially and upon reconsideration, and he timely requested an administrative hearing. The hearing was conducted on February 17, 2011 by Administrative Law Judge ("ALJ") Paul Martin. (AR 34-76.) Manning appeared and testified, and was represented by an attorney. Manning's wife, Candy Manning, and vocational expert ("VE") Deloris Jay, also testified. On March 21, 2011, the ALJ issued a decision finding that Manning was not disabled under the Social Security Act from his alleged disability onset date of September 13, 2006

through the date of the decision.  (AR 18-26.)  Thereafter, the Appeals Council denied

Manning's request for review, rendering the ALJ's decision the final decision of the

Commissioner.  (AR 1-3.)  Having exhausted his administrative remedies, Manning filed

the Complaint in this action on October 24, 2011.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity ("RFC"), which means the most the claimant can

still do despite his or her mental and physical limitations based on all the relevant

medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§

404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at

383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Manning had

not engaged in substantial gainful activity since his alleged onset date of

September 13, 2006.  (AR 20.)  At step two, the ALJ found that Manning had the

following severe impairments: degenerative disc disease of the lumbar spine and

trochanteric bursitis of the right hip.  (*Id.*)  At step three, the ALJ found that none of

Manning's impairments, alone or in combination, met or medically equaled a listed

impairment.  (AR 21-22.)  Next, the ALJ determined that Manning had the RFC to

perform light work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Manning] is limited to standing and walking for 4 hours total during an 8-
> hour work day.  He also requires the opportunity to stand briefly once every
> 1-2 hours.  He can frequently balance, but is unable to climb ladders, ropes
> or scaffolds[,] and can only occasionally stoop, kneel, crouch or crawl.

(AR 22.)  Given this RFC, the ALJ found that Manning was unable to perform his past

relevant work as a car wash attendant, newspaper delivery worker, material handler,

snow maker, delivery worker, and dishwasher.  (AR 24.)  Finally, based on testimony

from the VE, the ALJ determined that Manning could perform other jobs existing in significant numbers in the national economy, including the jobs of storage rental clerk and cashier II.  (AR 25.)  The ALJ concluded that Manning had not been under a disability from his alleged disability onset date through the date of the decision.  (AR 26.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.

## Analysis

**I. ALJ's Consideration of Medical Opinions**

In August 2009, Manning's treating physician, Dr. Michael Kenosh, opined that, although Manning had a history of lumbar radicular syndrome and degenerative disc disease, "he [wa]s appropriate for a medium to light level of physical activity according to U.S. Department of Labor Guidelines." (AR 514.) Dr. Kenosh further opined that, due to his history of chronic pain, Manning "may need the ability to change positions from time to time for comfort." (*Id.*) Approximately one month later, in September 2009, agency consultant Dr. Leslie Abramson similarly opined, based on her review of the record, that Manning was capable of light work, but was limited to four hours of walking/standing, and six-to-eight hours of sitting "with [the] ability to stand briefly once every [one-to-two] hours." (AR 519.) Several months later, on February 9, 2010, agency consultant Dr. Patricia Pisanelli made virtually the same opinion as Dr. Abramson: that Manning was capable of light work, but was limited to four hours of walking/standing, and six-to-eight hours of sitting "with [the] ability to stand briefly once every [one-to-two] hours." (AR 595.) One day later, on February 10, 2010, Dr. Kenosh gave a second opinion, this time stating that Manning was capable of only light work, and "would need

6

to be able to change positions for prolonged standing, sitting, or walking." (AR 601.)

The ALJ afforded "substantial weight" to Dr. Kenosh's and Dr. Abramson's opinions. (AR 24.) Manning asserts, however, that the ALJ should not have relied on the opinions of agency consultants Drs. Abramson and Pisanelli because they were formulated before Dr. Kenosh made his 2010 opinion. (Doc. 6 at 7.) Manning claims that if the agency consultants had considered Dr. Kenosh's 2010 opinion, "[i]t is entirely possible, and indeed plausible, that [they] would have limited Mr. Manning to sedentary work" instead of light work. (Doc. 9 at 2.) Manning's argument fails for three principal reasons. First, none of the physicians who made an opinion regarding Manning's physical capabilities limited Manning to merely sedentary work; as discussed above, consultants Drs. Abramson and Pisanelli limited Manning to light work, and treating physician Dr. Kenosh limited Manning to "medium to light" work in his 2009 opinion and light work in his 2010 opinion. Second, Dr. Kenosh's 2010 opinion is not contrary to his 2009 opinion (which the consultants appear to have considered) or the agency consultants' opinions. Rather, all of these opinions are consistent – Drs. Kenosh, Abramson, and Pisanelli all unambiguously opined that Manning was able to do light work but required an opportunity to change positions frequently.[1] (AR 514, 519, 595, 601.) The ALJ adopted these opinions in his RFC determination, finding that Manning could perform light work except that he could stand and walk for only four hours and

---

[1] Given that the consultant opinions are consistent with those of Dr. Kenosh, the Second Circuit's holding in *Tarsia v. Astrue*, 418 F. App'x 16 (2d Cir. 2011) does not apply. There, the court declined to affirm the ALJ's assignment of controlling weight to a consultant's opinion over that of a treating physician where, unlike in this case, the consultant's opinions conflicted with those of the treating physician. *Id.* at 18.

required the opportunity to stand briefly once every one-to-two hours. (AR 22.)

Manning argues that Dr. Kenosh's opinion that Manning was required to "change positions for prolonged standing, sitting, or walking" (AR 601) is inconsistent with the ALJ's finding that Manning was required to "stand briefly once every 1-2 hours" (AR 22). The argument fails on its face. If anything, the ALJ's finding is more restrictive than Dr. Kenosh's, which is vague enough (it is unclear what constitutes "prolonged" standing, sitting, or walking) to leave open the possibility that Manning was required to stand only every two or three hours instead of every one-to-two hours, as the ALJ found.[2]

Third, the agency consultant opinions – as well as those of Dr. Kenosh – are supported by the record, which reveals that although Manning suffered from back pain and had degenerative changes and a mild disc protrusion in his back (*see, e.g.,* AR 323), he was not severely limited in his functionality. In fact, as noted by the ALJ in his decision (*see* AR 23), the medical records consistently describe Manning as exhibiting exaggerated pain behavior, magnifying his symptoms, and having a "disability mindset." (AR 483; *see* AR 300 (testing scores reveal "extreme work[-]fear avoidance" and "very close to" range demonstrating "symptom magnification or pain amplification"), AR 366 ("inconsistent pain behaviors during the interview and exam"), 547 ("mild-to-moderate pain behaviors including over-reaction" observed during examination).) For example, a July 2009 treatment note from Dr. Kenosh states that Manning "has numerous red flags

---

[2] Manning also asserts that the agency consultant assessments were deficient because "there was no mention" therein of a 2006 RFC assessment which stated that Manning shifted position after sitting for twenty minutes. (Doc. 6 at 6 (citing AR 436).) This argument is unpersuasive, given that the assessment was completed in June 2006, approximately three months before the alleged disability period began. Also noteworthy, the assessment was completed by a physical therapist and an occupational therapist, not by a medical doctor like Dr. Kenosh and the agency consultants.

including positive Wadd[ell] signs[3], . . ., fear of activity, and active search for disability status.  (AR 358-59.)  The record also demonstrates that Manning was noncompliant with treatment plans.  In a September 2007 treatment note, Dr. Robert Giering stated:

> Overall, my opinion of Mr. Manning's case is that he does not seem greatly invested in his situation, and the reason I say this is because he has not quit smoking when recommended to do so in June.  In my view, he does not seem to be even trying toward that goal.  This is a red flag, because it is a form of addiction, and I believe that that does put him at increased risk for addiction to other things such as [chronic pain medications].

(AR 362.)  Similarly, in an August 2009 treatment note, Physician's Assistant William Zuber stated that, although he "emphasized the importance of [Manning] becoming more active," Manning "does not seem to be able or willing to increase his activity, and as [another doctor] noted, he seems to be in somewhat of a disability mindset."  (AR 529.)

Furthermore, several medical providers opined in treatment notes that Manning was not unable to work.  For example, in an April 2006 note, Dr. Kenosh stated that he "would not put [Manning] on formal work restrictions.  The only current treatment that I would recommend would be an exercise program."  (AR 370-71.)  He added that he observed "no significant clinical findings, no observed muscle guarding or spasm, no documentable neurologic impairment, no documented alteration in structural integrity, and no other indication of impairment related to injury or illness, no fractures.  The patient is therefore appropriate for zero percent impairment of the whole person."  (AR

---

[3]  There are eight clinical findings, otherwise known as "Waddell signs," which an examiner evaluates when assessing a patient complaining of back pain.  *See* 2 DAN J. TENNENHOUSE, ATTORNEY'S MEDICAL DESKBOOK § 18:4 (4th ed. 2010).  "Each sign is caused by non-anatomical (functional) factors and implies that the back pain has no physical cause.  *One or two of these signs may arise from patient anxiety or eagerness to cooperate.  Three or more are usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality.*"  *Id.* (emphasis added).

371.) Likewise, earlier that month, Nurse Practitioner Heather LaPoint stated that, although Manning had "multilevel degenerative disk changes" and "generalized low back discomfort," his MRI was "negative for disk herniation." (AR 372.) She further stated that she "encouraged [Manning] to continue activities as tolerated, and strongly encouraged smoking cessation." (*Id.*) Noting that Manning had recently been laid off at work, she stated: "I would not limit his activities, either at home or if he is pursuing new work activities." (*Id.*) Almost four years later, in March 2010, Dr. Kenosh again recorded his opinion that not only was Manning able to work, but working might in fact benefit him. The Doctor stated: "Besides increasing activity and returning to gainful employment, I have little else to offer [Manning]." (AR 623.)

Given that the opinions of the agency consultants and treating physician Dr. Kenosh were consistent with each other and with the record as a whole, I find that the ALJ did not err in relying on the consultant opinions in his decision.

## II.    Lay Witness Testimony

Manning next argues that the ALJ erred in failing to assess the credibility of the testimony of Manning's wife. Mrs. Manning testified at the administrative hearing that, on a typical day, Manning sat in his recliner; got up and moved around "a little bit"; and then laid on his bed "for a while." (AR 60.) She stated that Manning did not "tend to stay anywhere for extended periods of time," meaning that he changed position approximately every fifteen-to-twenty minutes. (*Id.*) Mrs. Manning further testified that Manning shifted "a lot" when he was in the recliner, and was "constantly moving in some way, shape[,] or form." (AR 61.) She stated that Manning attempted to do things around

the house, but had to constantly sit in between, and that if he tried to lift something, he "pays for it" for two to three days. (*Id.*)

In *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988), the Second Circuit remanded in part because the ALJ failed to set forth reasons for rejecting lay witness testimony. The court stated: "As a fact-finder, an ALJ is free to accept or reject testimony like that given by [a lay witness]. A finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." This case is distinguishable from *Williams*. There, the lay witness's testimony was "uncontradicted and generally consistent with the medical diagnoses," 859 F.2d at 260, whereas here, Mrs. Manning's testimony is contradicted by the medical records described above and in the ALJ's decision. Moreover, because the testimony in *Williams* was consistent with the medical record and critical to the ALJ's decision, its exclusion fatally undermined the ALJ's claim of substantial evidence for a finding of no disability. *Id.* Here, on the other hand, Mrs. Manning's testimony is substantially outweighed by the rest of the record, and therefore was not critical to the ALJ's disability determination.

Quoting *Williams*, in *Thibault v. Astrue*, No. 5:10-cv-188, 2011 WL 5024460, at *6 (D. Vt. Oct. 20, 2011), this Court found that the ALJ's failure to adequately state his reasons for rejecting a lay witness's statement was not harmless error, and remanded for consideration of the probative value of that statement. This case is also distinguishable from *Thibault* because in that case, the ALJ failed to mention the lay witness's statement at all, whereas the ALJ here discussed Mrs. Manning's testimony in his decision.

Specifically, after noting that Mrs. Manning testified at the administrative hearing, the ALJ stated: "[Mrs. Manning] asserted that [Manning] attempts to do thing[s] around the house, but has to constantly sit in between. If he tries to lift something, he will pay for it for 2-3 days." (AR 23.) Additionally, in *Thibault*, the court did not engage in a harmless error analysis, ordering remand on other grounds, and stating: "Because the court has already ordered a remand of this case, it need not decide if, in the absence of any other error, an ALJ's failure to even mention lay witness testimony, much less provide reasons for rejecting it, may constitute harmless error in circumstances not present here." *Id.* at *6 n.7; *see also McKinstry v. Astrue*, No. 5:10-cv-319, 2012 WL 619112, at *6 n.5 (D. Vt. Feb. 23, 2012) (distinguishing *Thibault* because there, the ALJ "ignored all the testimony of a lay witness" and "the court ordered remand on other grounds").

Here, although the ALJ did not explicitly state that he rejected Mrs. Manning's testimony, or the reasons supporting that rejection; it is evident from the ALJ's decision that he found Mrs. Manning's statements not credible, as he found Manning's own statements not credible, "to the extent that they [we]re inconsistent with the [ALJ's RFC] assessment." (AR 23.) Specifically, the ALJ stated that Manning's allegation that he spent an entire day in bed as often as two-to-three times per week lacked credibility, given that he "never reported such symptoms to a treating or examining source." (*Id.*) Moreover, referring to the evidence discussed above which documents the perceptions of Manning's medical providers that Manning exaggerated his symptoms, over-reacted to pain, had a disability mindset, and did not comply with recommended treatment plans (*see, e.g.,* AR 300, 323, 358-59, 366, 483, 529, 547), the ALJ noted that "the record . . .

contain[s] significant evidence of concerns of examining and treating sources that [Manning] has exaggerated his symptoms, has overused medications[,] and has been noncompliant with treatment recommendations" (AR 23). After describing the relevant evidence, the ALJ accurately concluded: "[T]he observations of . . . many sources cast[] significant doubt on [Manning's] veracity regarding the severity of his symptoms and his descriptions of his limitations of function." (*Id.*) The ALJ also accurately supported his determination that Manning was not credible by referring to evidence that Manning cared for his young daughter on a daily basis, prepared simple meals, cleaned for one-to-two hours daily, and shopped for food. (AR 24 (citing AR 232-39, 359, 549).) In fact, a Function Report prepared by Manning states that he "spen[t] [the] day car[ing]" for his three-year old daughter, including dressing her, preparing her meals, and changing her diapers. (AR 232-33.) Likewise, a medical note from Dr. Kenosh recounts Manning's response to the Doctor's recommendation that Manning incorporate regular exercise into his routine as follows: "[Manning] argues that he is already physically active as a stay-at-home dad with at least two daughters." (AR 359.) A medical note from Physician's Assistant William Zuber similarly states: "[Manning] tells me he is fairly active in caring for his young daughter . . . ." (AR 549.) This evidence, along with the record as a whole, casts doubt not only on Manning's own testimony and self-reporting, but also on Mrs. Manning's testimony regarding Manning's daily activities. I therefore find that the ALJ's reasons for rejecting Mrs. Manning's testimony are evident in the ALJ's decision, and are amply supported by the record.

In *Barreto v. Barnhart*, a case cited by this Court in *Thibault*, the Southern District of New York considered testimony of a lay witness and stated, "[t]he ALJ is required to set forth 'not only an expression of the evidence which s/he considered which supports the result, but also some indication of the evidence which was rejected. *In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.*'" *Barreto v. Barnhart*, No. 02 Civ. 4462(LTS), 2004 WL 1672789, at *4 (S.D.N.Y. July 27, 2004) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)) (emphasis added). In this case, however, the testimony of Mrs. Manning does not constitute "significant probative evidence," as the testimony was: (a) brief, comprising only approximately two pages of the hearing transcript (*see* AR 60-62); and (b) vague, stating for example merely that Manning got up from his recliner and moved around "a little bit," laid on his bed "for a while," and shifted "a lot" (AR 60-61). Additionally, as discussed above, the ALJ's decision reveals that the ALJ did not "simply ignore" Mrs. Manning's testimony, but rather, discredited it. Manning asserts that it is unclear whether the ALJ considered Mrs. Manning's particular testimony that Manning changed position approximately every fifteen-to-twenty minutes (AR 60), but he cites to no law stating that ALJs are required to discuss every sentence of a lay witness's testimony, even those that are clearly unsupported by the record. In fact, the law holds otherwise. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him

to a conclusion of disability."); *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (holding that ALJs are not required to discuss every piece of evidence, particularly where the court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that [the ALJ's] determination was supported by substantial evidence").

## III.   Vocational Expert Testimony

The VE testified at the administrative hearing that a hypothetical individual who could perform light work with a maximum of four hours of standing and walking, and sitting for the remainder of an eight-hour workday, with the ability to stand briefly once every one-to-two hours, would be able to perform the jobs of cashier II and storage facility rental clerk.  (AR 67-69.)  The VE stated that there were approximately 2,100 cashier II jobs in Vermont, but after accounting for Manning's sit/stand requirement, this number would be "eroded" by approximately forty percent.  (AR 69.)  With respect to the storage facility rental clerk job, the VE testified that there were approximately 161 of these jobs in Vermont.  (AR 69-70.)  At step five, the ALJ relied on the VE's testimony, finding that Manning could perform the jobs of storage facility rental clerk and cashier II, which jobs existed in significant numbers in the national economy.  (AR 25.)

Manning argues that the ALJ should not have relied on the VE's testimony regarding a forty-percent erosion of cashier II jobs based on a sit/stand limitation because this erosion "was based solely on [the VE's] professional experience," given that the Dictionary of Occupational Titles ("DOT") does not address a sit/stand option in connection with the cashier II job, and was "conjured out of whole cloth based upon

inadequate research." (Doc. 9 at 10.)  The Commissioner accurately points out, however,

that Social Security Ruling ("SSR") 00-4p specifically allows VEs to rely on their own

professional experience where, as here, the DOT does not apply.  That Ruling states:

> Information about a particular job's requirements or about occupations not
> listed in the DOT may be available in other reliable publications,
> information obtained directly from employers, *or from a VE's . . .*
> *experience in job placement or career counseling.*

> The DOT lists maximum requirements of occupations as generally
> performed, not the range of requirements of a particular job as it is
> performed in specific settings.  *A VE . . . may be able to provide more*
> *specific information about jobs or occupations than the DOT.*

SSR 00-4p, 2000 WL 1898704, at *2-3 (Dec. 4, 2000) (emphases added).  SSR 00-4p

further provides that, "[w]hen there is an apparent unresolved conflict between VE . . .

evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict

before relying on the VE . . . evidence to support a determination or decision about

whether the claimant is disabled."  *Id.* at *2.  Here, there was no "conflict" between the

VE's testimony and the DOT.  Rather, the DOT did not apply, given that it does not

provide a job addressing the particular hypothetical, including a sit/stand option, given by

the ALJ.  (AR 69 ("DOT does not address sit, stand option").)  In *Jasinski v. Barnhart*,

the Second Circuit explained:

> Whereas the [DOT] describes jobs as they are generally performed, an
> expert is often called upon to explain the requirements of particular jobs,
> and as such, his deviations from the [DOT] in such testimony do not
> actually "conflict" with the [DOT].  Many specific jobs differ from those
> jobs as they are generally performed, and the expert may identify those
> unique aspects without contradicting the [DOT].

*Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003).  Thus, the ALJ was not required

to "elicit a reasonable explanation" from the VE regarding any "conflict" between the DOT and the VE's testimony, and the ALJ was entitled to rely on the VE's testimony which was based on the VE's professional experience.

In fact, the VE testified in some detail about why she was required to provide more specific information than that provided in the DOT with respect to the cashier II job, and how she determined the degree to which that job would be eroded when adding a sit/stand limitation. The VE stated:

> [The] DOT does not address [a] sit, stand option [regarding the cashier II job], however on professional experience, cashier II for example working as a parking lot attendant or garage attendant often has a chair, a stool. A dining cashier may have a stool to sit on, [at] self[-]serving gas stations many clerks will be seated when you pay your bill if you don't have a credit card. So that many of them offer that option. I would say a minimum of about 60 percent.

(AR 69; *see also* AR 71 (VE responding affirmatively to question inquiring whether she relied on her experience to determine the sit/stand options).) The VE then responded affirmatively to the following question posed by the ALJ: "[S]o the numbers you gave me given the sit, stand option would be eroded by about 40 percent?" (AR 69.) Later, the VE stated that, although she did not conduct any formal surveys regarding the cashier II job, she "observe[d] constantly by virtue of [her] profession." (AR 72.) The VE further explained, in response Manning's attorney's objection based on the reliability of the VE's observations:

> I did not personally [observe] all of these [jobs] obviously. However, they are statistics that are b[r]ought together by people who do collect such numbers. No one VR counselor can canvas the whole state and view that many jobs. . . . Therefore I rely on statistics that can be provided for. . . . In this instance, these [statistics] came from the Vertek System.

(AR 75.) Manning seems to assert that the VE's opinion was worth little because she did not conduct any formal surveys regarding the cashier II job (*see* Doc. 6 at 10), but there is no requirement that VEs conduct surveys on every job they testify about. Rather VEs may rely on their own research and experience as the basis for their testimony, and ALJs are entitled to rely on that testimony in determining whether the claimant can do other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1566(e) ("If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used . . ., we may use the services of a [VE] . . . ."); *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (reconfirming "flexible" substantial evidence approach to disability proceedings, and holding that ALJ was not required to state reasons for accepting VE's testimony, which claimant challenged on grounds that VE's methodology did not reliably match the job types in the DOT with other data showing employment numbers); *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008) (affirming ALJ decision on "substantial evidence" grounds, and holding that, although VE did not provide the specific information claimant wanted, he properly "identified the sources he generally consulted to determine [his] figures," and noting claimant's failure to point to "any applicable regulation or decision of this Court requiring a [VE] to identify with greater specificity the source of his figures or to provide supporting documentation"); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the necessary foundation for his or her testimony."); *Palmer v. Astrue*, No. 1:10-cv-151-jgm,

2011 WL 3881024, at *6 (D. Vt. Sept. 2, 2011) (rejecting claimant's argument that data and reasoning underlying VE testimony must be available on demand, and finding VE's testimony "sufficiently reliable" because it was "based on identifiable statistics" and "informed by [the VE's] expertise and experience"); *Piekarski v. Astrue*, No. 08-cv-372S, 2009 WL 2992277, at *5 (W.D.N.Y. Sept. 15, 2009) (recognizing that Second Circuit has not addressed the required foundation for VE testimony, but accepting VE testimony based on verifiable sources and VE's own adjustments based upon his experience); *Irish v. Chater*, No. 95-315-B, 1996 WL 211797, at *7 (D.N.H. Feb. 27, 1996) ("An ALJ uses a vocational expert to provide an opinion, based on his or her expertise, on complex issues about a claimant's abilities and job market possibilities that cannot easily be resolved by reference to manuals.") (citing 20 C.F.R. §§ 404.1566(e), 416.966(e)).

Manning cites to this Court's decision in *Freegard* to support his argument, but that case is distinguishable. *See Freegard v. Astrue*, No. 1:11-CV-12, 2011 WL 4915744 (D. Vt. Sept. 20, 2011). There, the VE testified that the plaintiff could perform six different jobs, but then apparently applied a fifty-percent reduction with respect to the numbers of each of these jobs to account for the limitations identified in the assessed RFC. *Id.* at *10-11. The Court found that, although the VE discussed the fifty-percent reduction regarding one of the applicable jobs, there was no explanation regarding its application to the other five jobs. *Id.* at *11. Noting that "it would make little sense for the VE to have used an identical statistical reduction (50%) for each of six different jobs," and that, "at a minimum, some explanation from the VE would be required," the Court ordered that, on remand, the ALJ should solicit from the VE "an explanation

regarding the foundation and reliability" of the reduction in job numbers.  *Id.*  Here, the

VE applied the forty-percent reduction to just the cashier II job, and she explained her

rationale.  Moreover, in *Brault*, the Second Circuit recently held that, although a VE's

testimony cannot constitute "substantial evidence" if it is "'conjured out of whole cloth'";

"[n]othing more was required" where: (a) the ALJ asked the VE to affirm that he would

impartially evaluate the vocational evidence, and that, in the event of conflict between his

testimony and the DOT, he would advise the ALJ of the differences and the basis for his

opinion; (b) the ALJ identified a specific issue in the claimant's case where such a

conflict might arise; (c) the ALJ sought and received a stipulation from the claimant's

counsel regarding the VE's expertise and qualifications; and (d) the claimant's attorney

was given a full opportunity to explore the limitations of the VE's methodology on cross-

examination.  *Brault*, 683 F.3d at 450-51 (quoting *Donahue v. Barnhart*, 279 F.3d 441,

446 (7th Cir. 2002)).  Here, the VE's reduction in the number of cashier II jobs was not

conjured out of whole cloth, and the ALJ ensured that each factor listed above was met.

(*See, e.g.,* AR 63, 69, 71-76.)  In particular, the transcript of the administrative record

makes clear that the ALJ provided Manning's attorney with a full opportunity to explore

the limitations of the VE's methodology in determining the percentage of reduction of

jobs given Manning's sit/stand limitation.  (*See* AR 71-76.)

Finally, as noted above, in finding that Manning could perform other jobs existing

in significant numbers in the economy, the ALJ also relied on the VE's testimony that

Manning could perform the job of storage facility rental clerk.  (AR 25.)  Manning does

not challenge this finding.  Thus, even if the ALJ erred in relying on the VE's testimony

regarding the cashier II position, because the ALJ offered an alternative grounds to support his step five determination – which grounds Manning does not contest – there was no error. *See Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720 (GLS/DEP), 2008 WL 4793717, at *12 (N.D.N.Y. Oct. 30, 2008) ("even the finding that one job exists in sufficient numbers in the national economy capable of being performed by the plaintiff is sufficient to sustain the Commissioner's burden at step five") (citations omitted).

In sum, the VE opined that the ALJ's hypothetical person (described above) could perform two jobs existing in significant numbers in the national economy. Manning does not contest the VE's testimony or the ALJ's findings regarding one of those jobs; and the VE based her opinions regarding the other job on identifiable statistics, reducing those numbers by a percentage based on the sit/stand limitations assessed by the ALJ and not accounted for in the DOT. The VE provided a reasonable explanation for this reduction, and the record demonstrates that the percentage used (forty percent) was informed by the VE's expertise and experience. The ALJ was permitted to base his step-five findings on the VE's testimony, and was not required to seek more explanation than was provided here. Furthermore, as discussed above, the ALJ's hypothetical person accurately characterizes Manning's limitations and is consistent with the medical evidence and opinions. Therefore, I do not find that the ALJ erred in his step-five determination.

## Conclusion

For these reasons, I recommend that Manning's motion (Doc. 6) be DENIED, the Commissioner's motion (Doc. 7) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 17th day of August, 2012.


/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).